14-99005. Each slide has 30 minutes. I will basically keep you to your 30 minutes, however. Obviously, we know that there's a lot of issues. So as long as the court is asking you questions, I want to make sure that my colleagues have every opportunity to ask those questions. You may continue speaking. And I know, counsel for petitioner, you will tell me what your aspiration is in terms of reserving time for rebuttal. But what I will tell you, if we continue to use your time, just continue to answer questions, and I will give you some time for rebuttal. So we're ready to proceed. Thank you. Good morning. Good morning, Your Honor. May it please the court. John Grayley on behalf of Petitioner Richard Dean Clark. I wanted to focus on three major issues in this case. The juror misconduct issue, the counsel ineffectiveness of the plea issue, and the life history issue. And I understand the life history issue has yet to be certified, but I ask the court permission to address that in our case. If not, I'll move on to another one. Well, why don't we-let's start with the juror misconduct issue, I think. Maybe in the order that you've listed, I think you've got a good order listed. And so the question that I have on that is we have our case of Godoy, correct? That's correct. Have you ever heard how Juror Barnes came to light? No. I didn't see it in the record. It was part of habeas investigation. It was part of the normal course of habeas investigation to interview the jurors to find out-mainly to find out what their thoughts are on the case and the evidence, because that's always a good barometer. Well, generally, though, there is some sort of-that you're not supposed to dive into the actual deliberations if they give you access to the juries, correct? There's no specific prescription on what you can and can't interview a juror about. The jurors in California are free to talk about whatever they want to talk about to whomever they want to talk about. There are cases in which there are restrictions. But it wasn't a juror-initiated contact. No, no. So this is where you have to go to the court. You have to request the name and address of the people, right? You don't necessarily get them without the permission of the court. Actually, that's not correct, Your Honor. It is correct currently in California for a large number of cases. They have what's called townsville orders on them, which require you to do that. This is not a case that had a townsville order on it. And I think that that's supposed to be an individual's determination by the trial judge as to what the requirements are going to be. I guess just moving quickly into sort of exactly what happened, but it's my understanding, I think the district court commented on this, and I think that the AG is making some sort of contention that the statements that you're talking about go into the deliberative process and that they wouldn't be admissible anyway or something along those lines. The only statement that's been so identified is the statement that he found the minister's advice helpful. And we do have a dispute about whether or not that can be considered under 606B. But the rest of it, there's no dispute as to that. Okay. So he contacted a third person, which was his minister. Contacted his minister. I went through the record over the weekend. Five times throughout the guilt phase, the jury was given specific instructions not to do this. A hundred and four times they were reminded of it during the guilt phase. So he clearly violated his responsibilities as a juror and kept it hidden from everybody involved. It's our position that Godoy settles the case. Well, but you have to do, in Godoy though, you have to do two steps. Correct. And at the first step, if a court were to find, and this is, I guess, you know, we're not under AEDPA here, so if, or I'm just stating that, that that would be your argument. So we're doing this de novo anyway. So at the first step, there's still, the conduct would have to rise to the level that's set there to get the presumption of prejudice. That's correct. And then if it didn't, then that's the end of the inquiry, right? That's correct. And then we don't have all the arguments about Brecht and all of that. But if it gets to that level, then I'm assuming it's your position that Godoy would require that it be remanded for an evidentiary hearing. Well, you know, Your Honor, I think that's the real question in this argument, whether or not there should be a remand for an evidentiary hearing. I don't think there's any question. I guess there could be a question about the presumption of prejudice in this case. I don't know any court that's found that there's no presumption of prejudice in consulting your minister about the facts of the case. Could I step back for a moment? The constitutional violation at issue is a Sixth Amendment violation. I didn't think Godoy in the Atlantic cases was completely clear. And sometimes it says it's a due process violation. This seems to be a Sixth Amendment violation impartial jury. Is that your understanding? That's my understanding. There's also a due process issue in terms of being able to examine misconduct and things of that nature. So the question is whether the juror here was impartial or not. So if the juror was impartial or was found to be biased due to extraneous contact, then that would be a Sixth Amendment violation. Is that what the concern is, the constitutional concern? The constitutional concern is that you don't get a fair and impartial jury. And that's a Sixth Amendment concern. Hiding of the material, the hiding of the evidence is also a due process violation. I didn't get a chance to reserve my eight minutes for rebuttal, but I'll do that. You wanted to reserve eight? Well, you're not going to have eight left. But maybe I'll give you five for rebuttal. Counsel, I did want to clarify, just in the state of the record, I know we have the Barnes declaration. My first question is, is there any other record, transcript, or anything concerning Juror Barnes, or is that declaration it? Well, there's his normal course of voir dire and his questionnaire. But I mean, as to the issue about the contact with the minister. No, it was hidden until well after the trial had concluded. And there's no transcript of an interview with him of any kind? Not to my knowledge, no. And then in terms of the district court's rulings on this issue, I see ER 51 to 52, which is the granting of the habeas denial, and there's also ER 101. The district court touched on this twice, but briefly. That's correct. Any other rulings by the district court on this? No, not that I'm aware of. So that's the universe of facts. That is correct. All right, so anyone that's done jury work, I spent like 20 years doing it myself, either as a judge or a lawyer. You say this a million times to people. That's correct. Do you think that people probably talk to their spouses, even though the judges say that? Do you think that people probably talk to people that we don't know about? I know from personal experience, not everybody. So if we find out 10 years later that someone talked to their spouse, then this is the spouse. You put a declaration and said, oh, yeah, he came home, and he was saying it was really hard, and he did sit. Does that meet the first level of the DOI? Probably not, Your Honor. I mean, I would have to – there's a lot in the details. But, you know, I don't think we have a case anything like that. Well, but this case isn't like the DOI. The DOI, I don't know what that judge was thinking, giving like texting advice. I mean, it's hard for me to imagine. And then it was going back in the jury room. I mean, those are very aggravated facts. You're not – these facts are distinguishable from the DOI. It's not reading a Bible. We cannot allow jurors to go rogue and talk to their ministers about what they should do on a case. That's just improper. Following up on Judge Callahan's question. So in the DOI, it was not known exactly what the text messages were. And so there was an evidentiary hearing to develop more facts in the case. What would be the point of the evidentiary hearing here, given the juror's statement that his discussion with the most juror was this, and it confirmed his long-held belief? What would the evidentiary hearing be for? Well, Respondent has raised an issue about whether or not it was raised with the other jurors. That seems to be a – Well, but that's inconsistent with he just said he concealed it. But that's correct. I believe he concealed it. Respondent has raised – So did you get statements from all the other jurors? I got statements from several of the jurors that are in the record, but nothing about this issue, whether or not somebody mentioned consulting with his minister about it. We do have a statement from a juror that she was – the long holdout that she was criticized because of her Catholic religion. But I don't know if that was Barnes or not. So the point of an evidentiary hearing would be to determine whether this juror had shared this information with other jurors? Well, the point of any remand is for the state to come forward with evidence that rebuts the presumption of prejudice that we've established. Well, we have all the – Godoy makes some point of saying that the record was not sufficient to determine whether the contact was harmless. And so – and then goes on to say the most relevant evidence would be the actual content of the text messages. Whereas here, we do have the juror's statement about what the content of the communication was. Yes, we do. Yes, we do. And it meets both criteria, nature of relationship and the nature of the conduct. So if we have the relevant evidence, then we presumably could make the determination ourselves as to whether there was prejudice or not, whether it was prejudicial. Whether or not it raised the presumption of prejudice that Godoy requires this court to – Well, the presumption of prejudice when you don't know what the evidence is, and then you have an evidentiary hearing to bring out the evidence to determine whether it was in fact prejudicial or not. But here, apparently, we have the evidence in the statement from the juror. So I'm still wondering about the point of the evidentiary hearing. Well, I did raise that question in my briefing, but I think to back up a little bit, Your Honor, the Godoy inquiry is the presumption of prejudice, and Godoy found the presumption of prejudice based on those facts. Right, because they didn't know what was the content of the communication. So in other words, when you know there wasn't a contact with an extraneous third party, a presumption arises, which Godoy says could be rebutted based on a review of the text messages. So I'm curious about what additional information is expected here that an evidentiary hearing would be required for. I am as well, Your Honor. It's up to the state to come forward with evidence that rebutts the presumption. Well, we have the declaration, which potentially rebutts the presumption. Well, I respectfully disagree on that, but they must come forward with no reasonable possibility that this influenced the verdict. Because he says, he testifies in his declaration, I long believe that anyone who is guilty of murder and convicted with a special circumstance should be given the death penalty. So apparently his statement is that the minister's advice confirmed his longstanding belief, so it did not appear that it was prejudicial. It was prejudicial in the sense that it reaffirmed a belief that he should not have possessed in the first place, and that he also hid from everybody. That was improper for him to not disclose that to anybody, that that was his belief. That is antithetical to the construct of the death penalty in California. That is absolutely an incorrect assumption on his part, and he sought out his minister in order to verify, validate, and approve that assumption. And he got that, unfortunately, from a minister. We expect more from a judge, but probably a little more than this than from a minister. And that is the nature of the misconduct in this case. I don't think it's even a close case on the presumption of prejudice. So the misconduct now is that he may have stated something falsely on voir dire, is that what you're saying? He did state something falsely on voir dire, and that was part of the claim on Juror Barnes that was also denied, but that's not the crux of the misconduct either. Okay, so I think that if he had said in his affidavit that I have long believed that if a person is found guilty of first-degree murder and a special circumstance is found true, and I believe further that if the aggravating factors outweigh the mitigating factors, that they should get the death penalty, then he would have had a correct statement of the law. And so that's what was in his correct statement, is that what you're saying? I'm tracing it back, Your Honor, but the first part was that if the special circumstances are true, then the death penalty is appropriate. Not necessarily. That's not necessarily accurate. Well, it's appropriate if the aggravating outweigh the mitigating. It's appropriate if the aggravating outweigh the mitigating. I'm correctly stating the law, that he didn't correctly state the law in his statement. He directly contradicted his voir dire, and also the judge's instructions. So because this State has not come close to rebutting the presumption of prejudice in this case, the only question, I believe, is whether or not remand would be appropriate for them to come forward, as in the Hall case in the Seventh Circuit or the Barnes case. So what you're saying, we should just find the presumption and not allow an opportunity to rebut and find in the reverse. That's correct. Grant the writ. That is my argument. And what's the prejudice that made the juror not impartial? He got advice from his moral and spiritual advisor, the person he seeks moral advice from, his minister, that the death penalty would be appropriate under the facts of this case. And when he said that confirmed his long-held belief, what is the effect of that? The effect of that is he's been given a moral imprimatur to violate the law. Well, what if the minister, I don't know if this person is even alive, but what if he came in and said, I only said that the Bible or being a Christian does not prevent you, it's not a violation of your Christian beliefs to render a death verdict. That's obviously closer. That might rebut the presumption of prejudice at an evidentiary hearing in the land of the what-ifs, but I don't know that that's accurate. In fact, the more important thing, of course, is what juror Barnes thought he was being told. And that is why the nature of the conduct itself is so prejudicial. It's not necessarily what's being said, but it's also the nature of the conduct. And there's cases where we don't know what was said. In Godoy, we don't know exactly what was said. Nonetheless, because of the nature of the conduct, that is what rises to the level. I don't believe our rule is that if a person has extraneous contact with a third party, that's per se prejudicial. Absolutely not. Yeah, I don't think we have that. No, but we have, what we have here is moral authority on a moral question, the heart of the case. And that's a little different. I understand your argument as to why we should grant the writ as to the penalty phase. I'm not saying I agree with it, but I understand how you get there. As to guilt, though, I'm having a much harder time getting there. Can you explain how we get there as to guilt? Because it occurred in the guilt phase, the only way to get to what he's asking the minister about is to find guilt. The only way to get to this moral question in his mind that he's now resolved and cemented is to find guilt and special circumstances. And that would be the nature of the guilt presumption of prejudice as well. Admittedly not as strong as the penalty phase presumption of prejudice because the core advice went to the penalty phase, but still a violation and one that because it is a minister and because of the nature of the process, I would argue does raise the presumption of prejudice. But it's the same declaration we're looking at. That's correct. Okay. That's correct. So he just says during the guilt phase of trial it became clear that the special circumstances would be found true and that there would be a penalty phase. So he apparently did not consult about that issue. He just said it became clear. In his mind, I guess he was figuring out that the case is over at some point in the guilt phase, which is probably another violation. But that would be, but the jurors, there's no evidence that the jurors have begun deliberations. That's correct. It was in fact before deliberations. Before deliberations. And so probably another violation by the juror, but one that might be subject to 606B difficulties. Counsel, I had one question for you about some language in Godoy. I was trying to see if there had been any cases that have really dived into what Godoy means and there aren't. Maybe we're going to have to do that. But on page 968 of the opinion, and I'll just kind of frame it for you, the court talks about what to look at to determine harmlessness. And the court writes, once a defendant shows a possibly prejudicial contact, a presumption of prejudice attaches, and the burden shifts to the state to prove the contact was harmless, then it goes on to say, The state must rebut the presumption by pointing to some evidence contrary to the evidence that established it. Drawing contrary inferences from the same evidence is not enough. Poking holes in the juror declaration. Well, that's what I was going to ask you about. So we have this declaration, and we've been talking about how the state can possibly point to things in the declaration that would seem to undermine your point. But under Godoy, are we allowed to do that? No. I thought it goes on to say in a footnote that theoretically you could do that. Theoretically, yeah. Yeah, so they do recognize. We recognize that in theory the same declaration could both raise and rebut a presumption. So I don't see why that's a problem. Well, and don't forget they're talking about it in the context of a juror who's got undisclosed text messages and they don't know what's in them. Now, a juror declaration that says, I had a text messaging with the judge and it talked about, you know, how we get our lunch as jurors or something like that, then maybe that declaration doesn't. Well, he's referring to a declaration. He says, where the court looks only to one part of the declaration to conclude the presumption exists, but consults the declaration as a whole to conclude the context is actually harmless. So contemplates looking at different parts of the declaration. Perhaps, but certainly not in that case. And I don't think that that's true in this case either for the reasons I've expounded. And then that footnote goes on to say, but nothing in the case law suggests this is how the Maddox-Remmer framework works. Well, you know, Godoy. I'm just confused, that's all. Well, Godoy is important and the reason I think it got on Bonk Review is there's a lot of confusion in the court about how to deal with juror misconduct. And it was a real effort, a strong effort, to tell everyone how to deal with it. I'm so glad we were able to clarify. I mean, there will always be, you know, we're lawyers, there's always stuff to talk about in the margins a lot. But I think it's very clear, it's a very clear directive on how to go about doing this. And under Godoy, I think it basically settles the issue that I have with the court, before the court. Unless my colleagues have other questions, do you want to go on to the plea issue? Yes, I wanted to go on to the plea issue and the court asked about Logan. And I think the critical distinction in the Logan case is that both counsel gave advice that was not deficient performance. And they pointed that out three times in that case. And in this case, we obviously have one counsel who gave, at least that's the allegation, gave deficient performance. Well, I want to ask about that because, so Alan is the more experienced capital prosecutor, correct, that's called in? That's correct. All right, and he's the one that he said certain things about, I think I've got a chance at second degree murder or not getting, or getting LWOP, right? No, he said, I think that we can beat second degree murder. He was very focused on not getting LWOP with Richard Clark. Well, okay, but he didn't have a backup of, but I still think we've got a good shot at LWOP. I don't think that that was the description of the experience. Okay, so why is that, you know, I'm looking at the facts here. And I do think that he did have a chance at second degree murder. And the reason that, I'm just, I'm going to sort of lay this out and you can convince me why. Now, I mean, obviously the theory is, if the jury believes that he raped her and it's a murder that occurred in the process of the rape, then you're at first degree, right? And then you go, we'll go to the penalty phase. All right, but his theory of the case that the defendant basically says, and he says different things. Okay, he has inconsistent statements to the police. It would clearly, I think there's a strong case that he did not premeditate this in the sense that this young woman was 15 years old and he wasn't stalking her. She happened to not be able to get a ride and she ended up at the bus depot. And so it appears he's got a strong argument that this was a coincidental contact. Not that he was stalking her, not that he said, you know, I'm following her, I'm going to rape her, I'm going to do that. So whatever, we don't know because she's dead. We don't know exactly what was said before, but she's a 15 year old that hasn't used terribly good judgment in terms of walking home by herself at four o'clock in the morning, even though, and I think she's got in her backpack, some wine cooler stuff. So, you know, someone would argue, you know, so that would lend to the fact that maybe they were drinking before because he does show up with something with the wine cooler as far as, and he does, part of his defense was it started consensual and then it went wrong. I went into a rage. I blanked out any number of things. We have a young man that was, what, 18, 19 years old at the time. No prior record, so you can portray all of that. In the guilt phase, you have mental health issues, depression. He also has used, there's evidence of substance abuse and alcohol. Why is it humanly impossible that a jury wouldn't look at that and say, okay, it's a chance encounter. It started out consensual. It went bad. He freaked out, went into his rage, which was part of his defense. And so you don't have premeditation. You're at second degree. I mean, nothing's for sure, but I see a theory, and I see that that was his theory of the case. And I don't, you know, my years in the courtroom, to me it's not totally unbelievable that a jury could look at that situation. Could be, you know, unfortunately a little bit judgmental of this young woman that was walking out at night, placing herself in harm's way. Not that she deserved what she got by any stretch of the imagination. But I can see this scenario. Your Honor, I want to say one thing about that. I don't believe that she exercised bad judgment for one minute. I think she's a victim, and it's an unfortunate situation. And I think that if the CHP had come upon, had come to her aid as she had begged them to do, we wouldn't have had this problem. Well, you know, obviously, but you can't claim that as an intervening force in a 187. I just want to say, I just want to say, Your Honor, that in terms of second degree, the problem is that once you commit the homicide in the course of the rape, it absolves the intent issue as to – Well, yes, but didn't he say in certain parts that it started out consensual? It may have started out consensual, but he said that she was going to report him for rape, and he said, what are you talking about? And then he killed her. He clearly – one statement he says he'd like to have. Well, but is that – is there a legal theory out of that that could be second degree murder? A legal theory that I cannot fathom in the facts of this case. Well, in 20-20 hindsight, they didn't buy it. A legal theory that he came at because he didn't even know the evidence that was going to be presented at trial on that very theory. He didn't know about the statements that his expert had gotten from Mr. Clark that were going to be part of the case. At the time when he gave that advice, my understanding is he thought he could suppress the two different confessions that Mr. Clark gave, and he was not aware of Malin's efforts to develop the therapeutic relationship, and I believe it was before the suppression hearing. It was immediately before the suppression hearing. So at that point, the question is, was his view that the dissociative state theory could sufficiently mitigate intent for a second degree murder charge, was that inconceivable, or was that a reasonable determination by counsel? That is part of the analysis. The analysis actually under Loeffler and Hall is whether or not the advice affected the outcome, whether or not his advice. We don't have any declaration from Clark, do we, that he would have taken the plea? No, but we've pled it, and I don't know that we need it, need such a declaration in the case, and there's nothing about that in the case law, but we have pled that he would have. Well, you could certainly get a declaration that if I'd known that I was going to be found guilty of first degree murder in special circumstances and get the death penalty, in hindsight it would take a lot. The declaration would actually have to say, and should say, if I had known that my counsel was telling me about a pie-in-the-sky theory that has no basis in the evidence in the law, I would have certainly taken that deal. Well, I think, I mean, Mr. Allen says, I think it was Mr. Allen or Mr. Malin, one of the witnesses said that Mr. Clark was very influenced by Mr. Allen, who was like a father figure, but Mr. Clark does, and so had Mr. Allen suggested something else, he would have followed his advice, but I didn't see anything from Mr. Clark saying that. That's correct. I don't think the case law actually asks us to do that. But we have to find, we would have to determine that there was a reasonable probability that Mr. Clark would have taken the plea agreement, but for Allen's deficient advice, is that right? That's correct, that's correct, and that's why Allen's declaration is significant in this regard, because he says, look, if I had known what I basically, I should have known at the time, there was no way I would have asked Richard Clark not to take that deal, and we know that the relationship was a longstanding one, father figure one, as opposed to Brown, who came on board only weeks before the trial began. So from a problematic office that Mr. Clark had had a lot of difficulties with. So in terms of, we've used a lot of your time. Okay, my proposition, unless the panel otherwise objects, I'll give you five more minutes to address that third issue that you wanted to address, and then I'll give you five minutes on rebuttal. Thank you, Your Honor. In terms of the life history, the core issue here is that the jury was left with a profoundly incorrect view of who Richard Clark was, and it was a series of blunders and mistakes, but at its core, at its core, was the life history evidence and mitigation evidence that was not presented either in penalty or to any of the experts. I'll give the court some bullet points here. The trial testimony was that his father was expected too much of him and was frustrated with that. The mitigation testimony and habeas, he started beating Richard when he was eight months old, and those beatings continued throughout that period of when the father was with the children in the home. The testimony at trial, the dad was abusive to the mother, very unclear. One time he beat the mother. Mitigation evidence, he raped Diane in front of his children. He beat her in front of his children. The kids were present. Testimony at trial, he was depressed after his father's death and as a result of his mother's neglect. The mitigation evidence, the true mitigation evidence, he mutilated himself and electrocuted himself during that time period. The testimony at the trial was he had certain academic difficulties. The true evidence, longstanding, profound learning disabilities. The testimony at trial was he was truant for school. The mitigation evidence, he could not go to school. He was so psychologically disturbed by what was happening in his life, he was unable to go to school. The antisocial personality diagnosis, they knew it was inaccurate. It was used extensively by the prosecution. The prosecution had no aggravation evidence in this case other than the facts of the crime. I just have a question and maybe you can, as I'm listening to some of it, there's always like a difficult choice about a difficult childhood, is sort of that to use sort of stereotypes with in terms of that it can mitigate, but sometimes it can make someone look so bad that jurors go the other way in terms of that you don't want your client to look like a monster that's completely uncontrollable as far as that goes, because then therefore then he must have done what happened because that's what he's become. You know, Your Honor, I don't know of any. I know that that's a theory out there that's advanced in certain respects in certain cases mainly by state's attorneys, but I don't know of any, and I've been doing death penalty work for 35 years, trial and appeal. I don't know any death penalty lawyer that feels that that's a significant danger for their abuse testimony. I know death penalty lawyers who present evidence, life history evidence, to explain conduct, to explain the circumstances, to generate sympathy for their client, and to make sure the jury has an accurate portrayal of their client at trial, and that's not what happened in this case. Instead we have that he's a future danger as a result of this diagnosis, that he lacks remorse, things we know that are totally untrue. We know that from the interviews of the jail personnel who were there, who saw Richard Clark at that time. We know from his subsequent history, 35 years without a single write-up on death row. We know, we know that this is untrue and inaccurate portrayal, and we know why it happened, and it happened because of deficient performance by counsel. Counsel who was just throwing things out there, not understanding what his evidence was, and getting blindsided left and right, and labored under a conflict that couldn't cure perhaps the most damaging evidence in penalty, which was remorse. Thank you. All right, thank you, and we'll put five minutes on the clock for rebuttal. Thank you. Good morning. Good morning. May it please the court, Alice Luster on behalf of the warden. Beginning with the juror misconduct case, in response to Judge Owens, you had asked if there was any other evidence in the record that would contradict. And actually there is. The state, in responding to the state habeas claim regarding juror bonds, provided a declaration that's attached as Exhibit 1 to the informal response, and in that declaration it was prepared by an investigator for the state who recounted his visit to Juror Barnes and an interview with him conducted by himself and by Gene Castor, who was the prosecuting attorney in this case. And that declaration on page 3 says that Mr. Barnes told Mr. Castor and myself he had asked the minister how the minister felt about the death penalty issue. The minister replied, the Bible says an eye for an eye, and said he did not question the death penalty. Mr. Barnes also said the minister's statement did not settle the issue. The evidence in the case was the main thing that made Mr. Barnes decide on the death penalty. Mr. Barnes told us that he had not discussed the evidence from the trial with his minister. When the declaration was presented to him by Clark's agents, he had missed the part that refers to, quote, the facts of the case, close quote. Also, Mr. Barnes said that the talk with the minister came not during the guilt phase, but around the time the penalty phase was starting or about to start. This declaration... I'm sorry, can you give us the... is that in the excerpt of record? No, I'm sorry, Your Honor, it's not. Okay, well... When I was preparing for argument... Maybe, you know, going forward, that's obviously an important document. Yes, Your Honor, and that's, as I said, it was attached to the... as Exhibit 1 to the state's informal response in the state habeas proceedings. So this declaration was before the state court, and I think there's... which moves me into another part of this thing, is that... Well, that's kind of ridiculous that it's not in the record, in the excerpts of record. I'm sorry, and I apologize for that, Your Honors. That was something that was my overlooking in preparing for this argument. Is it part of the district court's record? Yes, Your Honors, it is. It is part of the lodge record with the district court. Okay, did the district court ever make any mention of this in any ruling? The district court did not. However, as I said, it would have been in front of the state court, who was the first one to look at this claim, and although the state supreme court denied it with a one-line disposition, there is no reason to think that the state court was not looking at all of the evidence, including that, when deciding that this claim lacked merit. We thought we were looking at all of the evidence. Yes, Your Honors, and again, my apologies for not finding that earlier and including it in the state, in the excerpts of record. So when are we going to see that? We can submit it as supplemental to the court, Your Honor. I'd be happy to do that. Well, I think we need to. All right. I don't think we should have to spend all the time looking for it if it was, obviously, and it wasn't the petitioner's responsibility to call it to the court's attention. That's correct, Your Honor. I would be happy to submit that tomorrow. You know, in terms of that, obviously, I mean, it's our responsibility to decide the case based on the law and what was before the court, but my understanding of your argument, I think Judge Okuda was asking you certain questions, and we've been ferreting out what we think Godoy said. Do you argue, well, we didn't have, there's something that was missing in the argument, but I understand your, I understood your argument more not to say that, you said that it was an improper conduct with the minister, you acknowledged that, but did you concede step one of the analysis that is made under the case law, the two Supreme Court cases that deal with it, or did you just go to abrupt analysis? No, Your Honor, we did not concede. I think we argued initially in the district court that, and here, that the rumor prior to this court's holding Ngodoy seemed to have been limited to jury tampering cases, and this was not that. All right, but you don't really even, but you kind of seem to have abandoned that argument here. You didn't mention that it was limited to that. All right, but the step one, what is your analysis under the step one? Because under Ngodoy, I mean, we're reviewing this de novo. Under step one, where do we get, what's your position about the presumption of prejudice? Our position, Your Honor, is that we are in a different procedural posture here than we are in Ngodoy, and that's part of the problem with trying to apply Ngodoy in this instance, in that, in Ngodoy, the state court did not appear to have addressed the claim. The district, or I'm sorry, the state court didn't properly apply Remmer. That's what this court found. And then the district court found that the state court's decision was fine, and therefore approved an improper application of Remmer in the state court. The district court, in its last contact with this, it was 2000 on a summary judgment, and then in 2014, my understanding is that the district court did make a Brecht analysis, because Ngodoy hadn't come out yet. Yes, Your Honor, I'm sorry. I was speaking to Ngodoy, the proceedings in Ngodoy, and I'm sorry if that was... So Ngodoy, we were under EDPA analysis, and so the first part was to say that the state court had an unreasonable application of Supreme Court cases, but then the second part was to review de novo the arguments, which is exactly where we are now, correct? Well, except, Your Honor, that one, we don't know that the state court, I mean, yes, we have a de novo review regardless of what the state court found, but we don't know that the state court did not properly apply the standards under Remmer. Well, so that's sort of irrelevant. Do you agree that we're talking about a Sixth Amendment violation? Yes, Your Honor. Okay, so we're looking to see whether there was a Sixth Amendment violation on the de novo habeas review. Yes, and under Brecht and under Frey, this court cannot grant habeas relief unless it finds a substantial and injurious effect, because this is reaching the court on collateral review. Well, if the jury was not impartial, I'm not even sure, under Nader, that's not even something for harmless error. That's a structural error, if it turns out that the jury was not impartial. Except that we have to make that determination. Is that true, though? Do you agree with that? No, Your Honor. Well, I think we have to make the determination that the juror was not impartial. Okay, so that's where we are now, right? Yes. There's a claim that there was a Sixth Amendment violation and the juror was not impartial because of the contact with the minister. Yes, Your Honor. And we've got evidence in this record. One, we think that, even as Your Honor pointed out in Dodoy, I'd like that case where we don't know what the contact was, here we have a better feel for what the contact was. So if we said there needs to be an evidentiary hearing, what additional information would be established through an evidentiary hearing? We have his declaration, which from what you said about the interview with Barnes was just presented to him by the defense counsel. So we have that declaration and then we have whatever this other document was, presuming it's part of the record properly before us. So we have those two pieces of information. What other information could be established in an evidentiary hearing so that the state could rebut a presumption of prejudice? And I'm not sure there is anything else that could be presented, Your Honor, and that's what the district court found, is that the petitioner, whose burden it is, at least initially, to present a claim and the factual basis for that, had not put forth anything that could be established in an evidentiary hearing. What about the minister? What about the other jurors, whether if other jurors said that he talked about it in the jury room? Well, presumably if those jurors were aware of that, they would have told defense counsel when they were being talked to before. But defense counsel could have certainly talked to the minister before. Okay, but that's when it was his burden. But if the burden shifts to you, then I'm saying what? That's not his burden then, right? If you're under the two-step, if you find the presumption of prejudice, then the burden is yours. That's correct, Your Honor. If you were to find that under Godoy applying it to outside the jury tampering scenario. I'm not telling you how to do your job, but if you have the presumption at that point, and it is that I'm thinking of things that the state could do if it came to that, but if you want to say there's nothing else and you want to lie down and take it, I can't tell you to do otherwise. We don't know what's out there. We know what he put in and we know when it's his burden, but if there's a presumption, then we know that Godoy says then in an evidentiary hearing, you've got a burden. And then I also know that you're arguing Brecht there, that you're arguing Brecht, but we don't really know clearly whether we can do that or not. And whether or not, I mean, part of the problem, Your Honor, is that this... I'm going to tell you, though, none of it's our burden. We're just trying to get the case right. Understood, Your Honor. Part of the problem is we don't know for certain how many, if any, of these people are still alive to be able to talk to. It does appear, as best we can tell, although this is not part of the record, that Juror Barnes himself may be dead at this point. So opposing counsel says, look, they've presented evidence that Juror Barnes contacted his minister, who opposing counsel says that's a moral authority and who gave him permission to impose a death penalty, and that's prejudicial. That makes him not impartial. So what's your response to that? Your Honor, I think we have conceded that Juror Barnes should not have spoken to his minister. There is no question of that. But that's a different question. The question is, that's undisputed. But to get past step one, there has to be some prejudice. It's not a high thing, and then it gets the presumption of prejudice. Are you conceding that is what she asked you? Oh, and I'm sorry, I misunderstood. And no, we're not, because the only thing that the Declaration specifically tells us is that the minister told him the Bible says an eye for an eye. And again, while he should not have consulted his minister at all, the eye for an eye statement is one that has been addressed by numerous courts over the years, numerous times. It's a well-known verse from the Bible. It's frequently brought up in these jury misconduct claims. And certainly Juror Barnes knew that. Yes, Your Honor. So why would he need to talk to the minister if that's all it was? And we don't know, Your Honor. That's the problem, isn't it? So the standard from Godoy says, whether there's a presumption, possibly prejudicial, is that the contact must raise a credible risk of influencing the verdict. So a credible risk of influencing the verdict. So is there enough in the evidence before us to know one way or the other, or would an evidentiary hearing be feasible, I guess? And you seem to indicate that you don't think there is any evidence out there that could be raised in an evidentiary hearing. Your Honor, I do know that Gene Castor is still alive. I do know that, at least unless he's passed away in recent weeks. But so I guess theoretically he would be a person that could be questioned regarding his contact with Juror Barnes. But it is our position that the declaration itself of Juror Barnes that was presented and is relied upon by Petitioner does not raise itself to the level of prejudice that would require a hearing. And why is that, the standard credible risk of influencing the verdict? Because what the declaration says, and again it's talking about the information he got was an eye for an eye, and although problematic because it goes to some of his thought process, but the declaration itself says it didn't affect him. Well, it doesn't say that. It says it affirmed. It's like if you ask someone for permission, I'm thinking about doing this, what do you think? Yeah, do it. There's a reason why they're speaking to the person. I mean, if there was no purpose to be gained from this, why did he do something that the court told him not to do 104 times? It may simply be threatened to his minister at church. Right, but you keep using this word may, may, may. The fact is we don't know, and this is why I think and I understand Godoy. Now, one argument you could be making to us is that because the district court didn't have the benefit of Godoy, that we could send this case back not for a hearing, but to apply Godoy in the first instance and the district court would make the determination. That is a path to me that would actually make some sense because the district court, in my view, applied the wrong standard, no offense to the district court, our standard is not very clear, and the district court in the first instance could do that, could look at this declaration you've just mentioned that none of us knew about in the first instance. Why not do that? And the reason why, Your Honor, is because this gets us back to the difference between the case here and the posture in Godoy. In Godoy, the district court found there was no error, that there had been no problem, that the state courts had done everything right. And this court said, no, state court got it wrong and you got it wrong. You didn't even properly determine whether there was error. So you need to do that. And that's why it was sent back for a hearing. Here, for all we know, the state court did it absolutely right, looked at it, found the jurors shouldn't have done that, applied Chapman properly, and that's why it denied it on the merits. We don't know because it was a simple denial. But we do know that the district court found there was error in the contact with the minister. So the district court found error, and then properly under Brecht and Frey Hold on, stop right there. Does Godoy apply Brecht? Godoy does not, Your Honor. And again, that gets back to the problem is Godoy was sending it back to the district court to make that initial determination of where there was error. If you were making the initial determination, say, in the state court, then you apply Chapman. If you're making the initial determination in the district court just to determine whether or not there was error, you might apply Chapman, but before we can grant relief on habeas, Brecht requires, even if we don't know whether the state court properly applied the Chapman standard, Brecht requires that we apply the substantial and injurious effect. And what case says that in this context? Well, I mean, nothing in the context of Godoy. Nobody's looked at it. Well, I mean, in the context of improper juror contact with third parties. I'm not talking jurors reading Bibles, jurors talking to a third party. What case says we apply, what Ninth Circuit case, I should say, says we should apply Brecht? Yeah, you have other circuits, but what about the Ninth Circuit? I don't believe I was able to find any that applied it in that instance, and that's the other. Well, the Fourth Circuit applied Brecht in a juror contact with a minister case, correct? I'm sorry? The Fourth Circuit applied Brecht in a juror contact with a minister case. Yes, which I think was also called Barnes. Can I turn your attention for a moment to the plea issue? Yes. And we had asked you to be prepared to discuss Logan. So Logan said no Sixth Amendment in effective assistance of counsel so long as the defendant gets non-deficient advice from one attorney, even if the other attorney's advice is deficient. So is that applicable here because the defendant received advice from Allen not to take the plea, but apparently, according to Malin's declaration, advice from Brown to take the plea? That's correct, Your Honor, it does. For whatever reason, Petitioner chose – Why didn't you cite it for us? I don't know, Your Honor. I thought I had, and I'm sorry if I didn't. But Malin's declaration certainly says that he and Brown pleaded with Clark to take – or strongly urged – urged Clark to take the plea. Do you know what the status of Logan is now? When I looked at it previously, there was a cert petition pending. No, Your Honor, I don't. I haven't seen any updates on that. Well, wouldn't that be something you'd be interested in before you come to court? Like if the cert petition had been denied? I mean, I think this is like 28-J stuff for you, but then if the cert petition were denied, I think it was filed March 18th of 2019. And I think, didn't we send something to both counsel to say be prepared to talk about Logan? Looks like cert was denied yesterday. Is that – I just want to make sure – is it Logan v. United States? Yes, Your Honor. It was – what do you have? I think the cert petition was 18-8433. Yes, it was – cert was denied yesterday. I apologize, Your Honor. I was traveling yesterday, and I should have looked up last night. I'm sitting with two Supreme Court law clerks, so that's not our job to be law clerks. And the court described – I should – yes, I should have looked it up again last night or this morning before I came over. But we submit that it is very – it is – this case is essentially Logan. And although – so there are distinctions with Logan. So in Logan, the attorney was not the attorney who was giving the deficient advice was not the attorney of record. That's correct, Your Honor. But he was the attorney who had been retained by the defendant's family, and the defendant was talking to him and, in fact, talked to him after he had previously agreed to accept the plea. But here, the one that's giving the advice not to take it is the capital expert. All right, that was associated because the other – the person that became the DA, is it Mussini or something, that – I don't know – that she'd never done a capital case. I don't know what she did – I don't even know – I don't know what she'd done, but she realized she was overhead and brought Allen in. So Allen's the big gun, as it were. And he's the one that's given him the advice, don't take it. You know, I'm here to save the day, and I can get you second degree. But two things on that. Yes, Allen was the more experienced capital attorney. However, Mr. Brown, although he had not been involved in the case as long, Dr. Maland, who had developed a therapeutic relationship with Petitioner over a number of interviews and talks and was treating Petitioner and had a strong – or appears to, from the record, have had a strong relationship, was seconding Brown and supporting him. So it's not like the lawyer. I'm sorry? Dr. Maland, I guess. Maland was not a lawyer. No, he was not. So wasn't Allen's advice – if we don't think Logan is applicable here, why wasn't Allen's advice deficient? His statement about the timing – I even thought there was a chance of second degree based on the fact that the rape was completed before any intent related to the murder was formed. How is that applicable here? That does not appear to be a correct statement of California law. Well, except that, Your Honor, for the special circumstance of rape, that requires a specific intent. For rape. But Allen never says there wasn't an intent to rape. He refers that there was a rape and does not challenge the conclusion that the sexual relation was rape. And given the overwhelming evidence in the case, I don't see how he could have. Except that, Your Honor, what we do have, as Judge Callahan was noting earlier, that we have evidence from Clark's statement that this was a consensual sexual encounter. Well, he says that in some of them, and in some of them he says it's rape. And then the medical review said the injuries were consistent with rape. And here was this 15-year-old girl. And Allen certainly doesn't say it was consensual. So Allen's statement that, based on the fact – second degree verdict – based on the fact that the rape was completed before an intent related to the murder was formed did not seem to me to be a correct statement of California law. Do you disagree with that? Is that a correct statement of California law? Well, no. If it was rape, Your Honor, it would not have – it would not be a correct statement. Okay. So his statement about his advice was first based on a misunderstanding of California law or an error of California law. And then it was also based on his view that he'd be able to get all of the confessions that Clark made, including in the patrol car, suppressed. And then it was based on his assumption that he could prove this dissociative state, which was also contrary to much of the evidence in the record. So I'm wondering what the basis would be, an argument that his advice, that he thought he could get life with parole or even second degree, what that was possibly based on. Your Honor, as I indicated before, the life – the special circumstances – Did Allen – what did Allen argue at the trial? What did he argue happened? He argued that there was a – that there was a blackout, an alcoholic blackout was what they were arguing, and that therefore he had no intent and did not even know what – Did the court give a second degree murder instruction? I believe it did. But you don't know. I don't recall right offhand, Your Honor, and I apologize. But Allen – excuse me. Sorry. Allen wasn't just saying to Mr. Clark – Did the petitioner testify? No, Your Honor. He did not. So all of his statements came from things that were from the police or to therapeutic people. That's correct, Your Honor. And the – Allen's advice on the plea was not simply, I can get you second degree, but I think I can get you something less than – He had life with parole if rape as a special circumstance was proven, and he doesn't seem to disagree that it was rape. And so therefore the only sentences available – if he had intent and there was rape, the only sentences are life without parole or death. So I don't even see where life with parole came in. I mean, I'm trying to understand what his thinking was, because we are instructed to give deference to the attorney, but I'm grasping at what his strategy was. So why don't you explain that? Well, did he argue on the intent argument? What was his argument relative to whether the special applied? If he said he blacked out and he put evidence in of him having mental health problems, what – did he say he couldn't have the intent to commit rape, or what was his argument? His argument was, I believe, mostly focused on the intent to kill. Excuse me. I'm recovering from a cold, and I apologize. I'm still a bit congested. But the other aspect of this is, at the time of the plea discussions, is that he had not yet been able to litigate the suppression of the statement. Well, I know, but when he argued the case, he had to – you make a closing argument, and you would have to get up and say, this is what you had before you. Right. And there is not – and he had to have said, did he say, and that's why you should return a verdict of second-degree murder, or what did he say? Or did he say, if you don't believe he had the intent, you should acquit him? What did he say? And I don't have that portion of his argument with me, Your Honor. Well, so it's kind of hard to evaluate whether he could make an argument of less than first degree in the specials if we don't even know what his argument was. Except that the plea proceedings are taking place before the trial, and we have to evaluate his advice on the plea at what he knew at the time that he was making the plea. Well, he knew there was a patrol car confession. That's correct. Where he didn't say anything about blacking out. And he knew that there was a tape-recorded confession where he does claim that he blacked out. And they have some evidence that the witnesses said he didn't appear to be intoxicated. I don't know if they have the blood evidence at that point, but the blood evidence later showed that the levels of meth in his blood were fairly low. So he knew that the only way he could challenge the intent was on some sort of best-case scenario of suppressing both of his confessions and making this dissociative state. Isn't that right? Isn't that the only thread of hope he had to try and get something other than rape plus murder? Yes, Your Honor. I mean, we think it was not unreasonable of him to make that, to lay out these positions. But I think the other aspect that we have to look at is in his declaration, Allen states that when he found out that the district attorney would not wait on suppression, on the litigating the suppression for the offer, that he went back to Clark and said it's either life without parole or go to trial. And so he came back to Clark with that choice. And at that point, Mr. Clark said, I'm going to trial. And that is despite the similarity to Logan where his other counsel was urging him to take the deal from the beginning, where a trusted psychiatrist who was treating him was urging him to take the deal from the beginning. And there simply is nothing. Well, what was Brown's advice? What we know from Dr. Maland, and that is in the excerpts of record. Brown's dad. Brown's dad, yes. And that both he and, both Maland and Brown, quote, tried very hard to get Richard to accept the plea offer. And that's at excerpt page 489 in Dr. Maland's declaration. So they were, we don't know exactly what was said, except that we do know that they were telling him to take the plea offer. We know that Dr. Maland says that both he and Mr. Brown and possibly other members of the defense team felt that that was his only chance of avoiding death. So presumably that fed into this tried very hard that they were telling Mr. Clark that this was his only chance to avoid death. My colleagues don't appear to have any additional questions, and we've taken you over. So we'll wait for five minutes to rebuttal. Thank you. Thank you, Honor. Just briefly, I wanted to touch on a couple of things. I have a question. It's not your responsibility, and I'm not, but this declaration that we're hearing about for the first time, I would like to hear whether that was in the record. It was presented in support of summary judgment on this claim in 2000. In the context of summary judgment proceedings, Petitioner objected because it was hearsay and that the court couldn't consider it as part of its ruling. And then it disappeared from the case until today. Are you saying it hasn't been in the record since then? It was in the district court record. It was in the district court record. Was it in the state court record? I believe they did submit it to the state court, which is, you know, 21 years waiting for a hearing on jury misconduct, and they present contrary evidence, and I cannot fathom why the state Supreme Court would not grant at least a hearing at this point. I mean, we've waited 21 years for this, and there is clearly, if you could. But I'm not faulting you for not bringing it up, but if it was in the record. I think it's waived. I think it's hearsay. It's inadmissible, and I think the district court. Well, why wouldn't your declaration be hearsay then? Because it's his own statement as to what occurred. He has firsthand knowledge of it. This was an investigator's, I mean, we're talking about something we've never seen, but this was an investigator summarizing a conversation with Barnes. Correct. A different conversation. A different conversation. And has the district court in this case, you mentioned 2000, has the district court ever acknowledged the existence of this declaration? I think the district court cited to the declaration at some point there was no ruling on whether or not it was admissible. I do know that. And I specifically requested one. Of course, you have to do that in summary judgment. And so it was left hanging in the case. I thought it wasn't part of the case anymore because it hadn't been talked about in the briefing, but if they're going to raise it now and argue that it somehow rebuts the presumption, I'd like the opportunity to address some of the future comments. Well, it was before in 2000. It was there in 2000. It was there in 2000. And in 2014, we didn't have the DOI, so that's. That's right. That's right. I mean, I don't know why they didn't get a firsthand declaration from Juror Barnes to this material if it was so important to them. I will have to answer for that at some point, I assume, or maybe not. But it's clear hearsay and it clearly can't be considered as evidentiary proof. I mean, if I had presented an investigator declaration as they did, I think, in the Hall case, the Seventh Circuit case, it would get remanded because of the presumption of prejudice for determination as to what the facts specifically were to determine whether or not they rebutted the prejudice, rebutted the first showing of prejudice. So all I'm asking is if they're going to submit it now, that we have the opportunity to submit a short brief on the factual circumstances of it and what our position was in the district court and things of that nature. And I certainly would have addressed it in my briefing if they had raised it. The court, counsel's argument about the state court, I think, highlights some of the difficulties here. They argue that the state court would have applied the Chapman harmless error analysis. The state court was bound to apply the Remmer analysis in the post-conviction. Well, the Remmer analysis is for the purpose of determining whether there was a sixth amendment violation. The Godoy did not say that Remmer was constitutionally required, that an error in failing to have a hearing was a constitutional error. It said that it's a requirement from the Supreme Court in order to determine if there's a sixth amendment violation. So I don't see how Chapman would apply for a court that failed to do Remmer. So maybe you can explain that to me. That's whether there was a trial error that was harmless beyond a reasonable doubt. It's generally, well, I don't know that beyond a reasonable doubt harmless is the standard. Well, it's Chapman. But it's also a burden that the state bears. But in terms of my argument here is that the state Supreme Court presented with these facts in post-conviction should have undertaken that type of analysis. Right, and we would be relieved of that deference, which we are anyway. So here we are looking at this issue de novo. That's correct. That's correct. I wanted to touch briefly on the Logan issue, if I could. I see my time is up. One minute. Do it briefly. All right. I think we can't lose track of Loeffler and Hall and the standards in Loeffler and Hall. And they are whether or not the advice caused the outcome. Whether or not the advice was deficient caused the outcome. And Logan doesn't insulate us from that inquiry just because some other lawyer said something different. And I think that that's the- So if he has effective assistance of counsel and he chooses to go with other counsel, how do we analyze that? I mean, one of his lawyers gave him appropriate advice, let's say hypothetically. The other one, let's say, was deficient in his advice. So he was presented with a choice and he made a choice. So how do we analyze that under the Sixth Amendment and effective assistance of counsel? We analyze it in terms of what choices he actually had, who was presenting the information to him, and what information they were presenting. And we can't lose track of the fact that what he was presenting to Richard Clark was a second degree verdict. That's what he was presenting. And there was no way to get second degree. The colloquy that the court had earlier was all about first degree, but there's no way to get a second degree given the facts of this case. And so that was the promise that was made. That was the representation that was made. And that was the error that counsel made, which Your Honor keyed in on. And so that's what we look at. We look at what are the circumstances of the representation here. So his advice was, let's say his advice was, Allen's advice was deficient. Let's assume for the moment that it was deficient. But Brown gave him appropriate advice, effective assistance of counsel, and defendants are allowed to make this decision themselves. The Supreme Court has said that when it comes to taking a plea, that is the decision for the defendant. Well, yes, it is the decision for the defendant, well advised. And just because there's a disagreement in the defense camp doesn't just automatically say, well, he got his Sixth Amendment right here, because he's not getting his Sixth Amendment right from his lead counsel, the guy who's been with him for two years, the guy he knows intimately, the guy he respects, the guy he follows, the guy he will follow. So if we follow Logan, if we say we don't want to make a split with our sister circuit, does that counsel us to say there's no Sixth Amendment violation? Logan is easily distinguishable. There's no deficient advice in Logan. Neither counsel rendered deficient performance. So the one hired by his parents gave him advice which the court thought was bad. Well, that lawyer had a lot of problems, but it was, in retrospect, bad. But lawyers have to make judgments all the time about whether they beat a case or not. It wasn't, hey, I can get you second degree because even though it's a rape, we can wiggle our way through it and get a second degree verdict here, which was obviously what Richard Clark got. Well, thank you both for your argument. This matter will stand submitted. This court is in recess. All rise. This court for this session stands adjourned. I guess I'm assuming that counsel for the Attorney General is and when will you be submitting? We'll submit that tomorrow, Your Honor. I won't be back in the office until tomorrow. All right. When we will, as we discuss the case, determine if it requires any additional action from the petitioner.  Thank you. Now we're really adjourned. I'm sorry.
judges: Callahan, Ikuta, Owens